In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2755

TRAVIS DORVIT and MICHAEL MARTIN,
derivatively on behalf of POWER
SOLUTIONS INTERNATIONAL, INC.,

*Plaintiffs-Appellees*,

*v.*

GARY S. WINEMASTER, *et al.*,

*Defendants-Appellees*,

*and*

POWER SOLUTIONS INTERNATIONAL,
INC.,

*Nominal Defendant-Appellee*,

APPEAL OF: GARY MCFADDEN,
derivatively on behalf of POWER
SOLUTIONS INTERNATIONAL, INC.,

*Intervenor-Objector-*
*Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-01097 — **Thomas M. Durkin**, *Judge*.

ARGUED FEBRUARY 13, 2020 — DECIDED FEBRUARY 28, 2020

_____

Before FLAUM, MANION, and BARRETT, *Circuit Judges*.

FLAUM, *Circuit Judge*. The named plaintiff in a failed state derivative action seeks to reverse the district court's approval of a settlement in a related federal suit. The court below adequately considered the propriety of the settlement's terms and we now affirm.

## I. Background

### A. Facts

Gary Winemaster founded Power Solutions International, Inc. (PSI) as a private company in 1985. The company designs, makes, and distributes engines and power systems to equipment manufacturers around the world. Winemaster served as PSI's Chairman, President, and CEO until resigning in 2017.

In 2011, PSI merged with an existing corporation and became a publicly traded company. From the time of the merger until his resignation, Winemaster and his brother were PSI's majority shareholders. As a public company, PSI began implementing (apparently suboptimal) internal controls and reporting standards. The company's early annual 10-K filings with the Securities and Exchange Commission noted that PSI's "internal controls over financial reporting" suffered from "material weakness." Nonetheless, over the course of 2013, PSI's per share price rocketed from $16.18 to $75.10.

PSI's shares sustained a high valuation until August 2015. At that time, the company began making a series of disclosures, beginning with a revision to its earnings guidance. PSI

eventually admitted that it needed to restate two full fiscal years' financial statements. PSI's auditor resigned, its share price plummeted, and the government began investigating the company. It became clear that PSI had improperly recognized millions of dollars in revenue. In early 2017, Winemaster resigned from all three of his leadership roles.

In March 2017, PSI announced that Weichai America Corp. (Weichai), a Chinese diesel engine manufacturer, planned to buy a 20% equity stake in the company with the option to purchase additional common stock up to a majority position. As part of the deal, Weichai could select two new directors, enlarging PSI's board from five to seven seats. In the aftermath of the investment, four existing PSI directors resigned. By the time the board's realignment was complete, six of PSI's seven directors were unaffiliated with the company during the period of alleged misconduct.

In June 2017, PSI's former chief operating officer filed a whistleblower complaint alleging he had been terminated because he reported PSI's violation of Generally Accepted Accounting Principles and securities laws. In July 2019, the federal government charged Winemaster with multiple criminal fraud counts.

### B. Procedural History

There were multiple parallel suits in federal and state court related to this case. We begin with a summary of the federal suits.

In 2016, PSI was sued for breach of federal securities laws in a purported class action in the Northern District of Illinois. (The direct lawsuit is not at issue in this appeal.) In February 2017, plaintiff Travis Dorvit filed a derivative complaint on

behalf of PSI in the same District, alleging fiduciary breach and unjust enrichment against certain of PSI's officers and directors. In March 2017, the district court stayed the derivative case pending PSI's motion to dismiss the class action.

In April 2018, plaintiff Michael Martin filed a second derivative suit in federal court, which was transferred to Judge Durkin below. Dorvit and Martin then filed a joint verified second amended derivative complaint. It realleged most of the same claims as before, with additional claims against PSI's five new directors who had been seated in the interim.

In July 2018, the parties in the class action settled and the district court subsequently lifted the stay in the derivative suit. On October 1, 2018, both the individual defendants and the company moved to dismiss the derivative suit; PSI contended that the plaintiffs had failed to make a pre-suit demand on the board of directors.

The parties then began mediation and settlement negotiations, executing an agreement in May 2019. The settlement called for a monetary award of $1.875 million from PSI's director and officer liability insurers, of which plaintiff's counsel would get half. The rest of the money would be earmarked for expenses related to the government's investigations. The settlement also required the formal enactment of seventeen corporate governance reforms, primarily focusing on strengthening the work and integrity of the company's audit functions. In exchange, the plaintiffs agreed to a release against the individual defendants, including Winemaster.

The plaintiffs moved the district court to preliminarily approve the settlement, but the court asked for further reassurance regarding the corporate reforms. The parties prepared a

plain-language explanation of each of the reforms, and in late May 2019 the court granted preliminary approval.

Before discussing the settlement's final approval, we turn to the parallel state cases. In May 2017, two plaintiffs filed state derivative actions on behalf of PSI in the Cook County Court of Chancery. The state court eventually deemed one complaint operative. It was substantively identical to Dorvit's initial federal complaint but included additional claims against PSI's accountants. Intervenor Gary McFadden eventually substituted as lead plaintiff on this state derivative action.

In November 2018, the state court dismissed the McFadden complaint, ruling that the federal derivative suit sought identical relief and the state case was thus duplicative. McFadden appealed the dismissal and then intervened in the federal case, filing his objections to the settlement between its preliminary and final approvals. He argued that the monetary component was insufficient, particularly as half would be going to lawyers, and that the proposed governance reforms lacked substance. McFadden further objected to the release of liability against Winemaster.

During the approval hearing, the district court considered the objections to the settlement plan. The judge took note of the fact that, because a majority of PSI's board was unaffiliated with the company during the time in question, any derivative plaintiff would have a serious issue meeting Delaware's demand futility standard. Determining that the corporate governance reforms were meaningful, the district court overruled the objections and granted final approval to the settlement.

McFadden timely appealed. While this case awaited argument here, the Illinois Appellate Court affirmed the dismissal of McFadden's state court derivative action.

## II. Discussion

McFadden asks us to find that the district court abused its discretion in approving the settlement of the plaintiffs' derivative claims. We expect district courts, in assessing proposed settlements, to "weigh the probabilities and possibilities of victory or defeat as indicated by the legal or factual situation presented and determine whether the compromise, taken as a whole, is in the best interest of the corporation and all its shareholders." *United Founders Life Ins. Co. v. Consumers Nat. Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971) (internal quotation marks and citation omitted). "[I]n reviewing the appropriateness of the settlement approval or disapproval, the reviewing court should intervene only upon a clear showing that the trial court was guilty of an abuse of discretion." *Id.*

Here, the district court adequately weighed "the probabilities and possibilities of victory or defeat" and it did not abuse its discretion. As explored below, it was appropriate for the district court to place significant weight on the demand futility issue, which is a critical, substantive aspect of derivative suits.

### A. Derivative Actions and Demand Futility

As a preliminary matter, we find it helpful to briefly discuss the nature of a derivative suit. "A derivative suit is brought by an investor in the corporation's (not the investor's) right to recover for injury to the corporation." *Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998). Because corporate decisions (such as suing on its behalf) are typically in the hands

of the board of directors, derivative suits represent an anomaly of corporate governance. "Only when the corporation's board defaults in its duty to protect the interests of the investors" may a plaintiff pursue a derivative suit. *Id.*

For this reason, the Federal Rules of Civil Procedure place a special pleading requirement on would-be derivative plaintiffs. Rule 23.1(b)(3) requires that derivative plaintiffs plead with particularity their reasons for not attempting to compel the company's board to take a desired course of action. We refer to this obligation as a derivative action's "demand futility" requirement.

The upshot is that derivative plaintiffs must show that a court should usurp the business judgment rule, which normally protects directors' decisions. *See In Re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003) ("[D]emand can only be excused where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule." (quoting *Aronson v. Lewis*, 473 A.2d 805, 808 (Del. 1984))).

In *Aronson*, as we have explained, the Delaware Supreme Court laid out the familiar two-prong test for demand futility, holding it is established where "the alleged particularized facts raise a reasonable doubt that either (1) the directors are disinterested or independent or (2) the challenged transaction was the product of a valid exercise of the directors' business judgment." *Abbott*, 325 F.3d at 807 (citing *Aronson*, 473 A.2d at 814).

The district court noted that there was a significant chance that, had it ruled on PSI's motion to dismiss the derivative

suit, it would have found the demand futility requirement unmet. Because the board in place at the time of the operative complaint had a majority of new directors who could not be tied to the company's revenue recognition issues, the plaintiffs were unlikely to establish that a majority of the directors were conflicted or lacked independence.

McFadden does not meaningfully address this point, arguing instead that demand futility is "merely one aspect of a shareholder derivative lawsuit" and a "procedural, pleading requirement" that is "separate from the substantive merits" of the claim. This is incorrect and squarely contradicted by precedent: "The function of the demand futility doctrine … is a matter of substance, not procedure." *Westmoreland Cty. Employee Ret. Sys. v. Parkinson*, 727 F.3d 719, 722 (7th Cir. 2013) (citing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96 (1991)). Because derivative actions by their very nature require a showing that the board cannot act as it should, the allegations demonstrating this inability are substantive. Contrary to McFadden's argument, the demand futility requirement is not a mere technical, procedural hurdle. Demand futility is a substantive *sine qua non* of derivative suits.

McFadden contends that the district court put too much weight on the demand futility issue, and essentially should have performed a more "holistic" analysis that gave greater consideration to the strength of the underlying breach and unjust enrichment claims, particularly in light of the whistleblower and criminal suits against PSI. As discussed above, McFadden misunderstands the nature of a derivative suit: the ability to demonstrate demand futility *is* a substantive element of the strength of such an action.

McFadden claims that "[a]ll told, whether or not the Federal Plaintiffs could satisfy Rule 23.1's pleading requirements is not — and cannot be — dispositive for the purposes of weighing the strengths of the derivative claims here." That is incorrect. If a plaintiff cannot show demand futility in a case, that disposes of his derivative claim.

In sum, the district court's close attention to the demand futility weakness in the plaintiffs' claims was appropriate. We now turn to McFadden's claims that the district court abused its discretion in approving the monetary award and the corporate governance reforms.

### B. Money Damages

McFadden claims that the settlement's $1.875 million in money damages was insufficient when compared to the potential recovery should the derivative suit have proceeded.

> Though we have elucidated several factors to guide a district court's analysis of whether a proposed settlement is fair, reasonable, and adequate, we have repeatedly stated that the most important factor relevant to the fairness of a class action settlement is ... the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 284 (7th Cir. 2017) (internal quotation marks and citations omitted). McFadden argues that the total monetary award should have been higher, particularly where the plaintiffs' lawyers were going to be awarded over $900,000. But McFadden's argument is hampered by the fact that, as discussed, the ability to show demand futility is a substantive component of

the strength of the derivative case. That plaintiffs' ability to show demand futility is doubtful weighs in favor of a smaller monetary award.

*Kaufman* concerned the approval of a class action settlement, another area (besides derivative suits) where courts typically review terms agreed to by private parties. *Id.* at 279. There, intervenors objected to a proposed $1.8 million settlement, the figure that the district court found appropriate considering the defendants' possible arbitration defense. We declined to hold that the district court abused its discretion in approving the settlement:

> The Intervenors argue that the district court improperly analyzed this factor by giving too much weight to Amex's potential arbitration defense. The district court concluded there was a significant risk that this court would reverse the district court's decision and send the action to arbitration, where the Plaintiffs would likely receive nothing. Because of that risk, the district court concluded that the approximately $1.8 million the class would receive from the settlement was a reasonable recovery.

*Id.* at 285.

Here, the district court similarly discounted the strength of the plaintiffs' case because of the risk of dismissal for lack of demand futility. The court's detailed analysis of this factor tracked our precedent's requirements. In the approval hearing, the court explained:

I have to determine whether or not the settlement is fair, reasonable, adequate, and should be approved.

The amount of the defendants' settlement offer compared to the strength of the case, it is something versus nothing. This case could have … been dismissed. Not saying it would, but it could have been dismissed. And I think the parties recognized—especially the plaintiffs recognized—the shaky grounds by which this case could have proceeded.

To extract any money in a derivative case I agree is unusual. And in this case, it is—it is real money. It is $937,000 or more, depending on the amount of fees I approve, if I lower the request for fees.

…

Had the settlement not occurred, there'd be inevitable—even more expenses going against the insurance policy, which ultimately would harm the company when that policy had been completely eroded, all for a result which probably wouldn't be any better than what we have, which is a number of substantive corporate governance reforms.

So for all those reasons, I believe the settlement is fair, reasonable, adequate, and should be approved.

McFadden has not proposed an alternate monetary figure, let alone provided a reasonable justification for one. In these

circumstances, the district court did not abuse its discretion by approving the $1.875 million in money damages.

## C. Corporate Governance

McFadden next asserts that the proposed corporate governance reforms—which would be formalized under the settlement—lack substance. Specifically, McFadden insists that PSI already undertook a number of these reforms prior to settlement, so their formalization is mere window dressing.

This claim fails because, as the district court recognized, many of the proposed seventeen reforms had been undertaken prior to the settlement but *after* the company's investigation into its revenue recognition problems began. McFadden fails to distinguish between these timeframes. The defendants and plaintiffs convincingly argue that these reform efforts began after the malfeasance, and the district court was correct to acknowledge that there is value in having such requirements written and formalized.

Moreover, McFadden failed to properly object to fifteen of the reforms, limiting his criticisms below to two of the seventeen. The following colloquy at the approval hearing is illuminating.

> THE COURT: Well, are there—I saw nothing from you with a proposal—other proposals for corporate governance, which is typically one of the remedies in a case like this. But I saw nothing from you proposing new corporate governance proposals that go beyond what are here, just an objection to two of the 17, saying they're already doing it. Have I correctly summarized your objection?

MR. CHANG: Yes, that's correct.

Turning to the substance of the reforms themselves, they go beyond mere window dressing. Below is the plain-language description of each reform and the practice that preceded it:

1. The Audit Committee must meet at least six times per year.
• (Formerly) The Audit Committee must meet quarterly.

2. The Director of Internal Audit must be a senior vice president (or higher).
• (Formerly) No prior requirements for the Director of Internal Audit existed.

3. The Audit Committee Charter will require the Director of Internal Audit to communicate at least quarterly with the Chief Financial Officer, Chief Executive Officer, and Audit Committee, attend all Audit Committee meetings, and meet at least quarterly with the Audit Committee.
• (Formerly) None of these requirements existed.

4. The Audit Committee must meet quarterly with the Company's Auditors, without management present, to discuss candidly any audit problems or difficulties and management's responses to the Auditor's efforts to resolve such problems.

• (Formerly) Although the Charter currently requires the Audit Committee to conduct such meetings, it did not specify the number or frequency of these meetings.

5. The Audit Committee must discuss and review with management quarterly the Company's major financial risk exposure and the steps management takes to implement plans to monitor and mitigate such risks.
• (Formerly) The Charter previously did not specify the frequency of these reviews.

6. The Audit Committee must annually review the Company's procedures for monitoring compliance with laws and regulations, the Company's code of conduct and other policies relating to compliance with laws and regulations.
• (Formerly) The Charter previously did not specify the frequency of these reviews.

7. The Audit Committee must publish its Charter on the Company's website and keep it up to date.
• (Formerly) None of these requirements existed.

8. The Director of Internal Audit must: (a) report directly to the Audit Committee, (b) communicate at least quarterly with the Chief Financial Officer, Chief Executive Officer and Audit Committee, (c) attend all Audit Committee

meetings, and (d) meet at least quarterly with the Audit Committee.

• (Formerly) None of these requirements existed.

9. The Director of Internal Audit must have full and free access to the Audit Committee and vice versa.

• (Formerly) No formal policy regarding the Director of Internal Audit's access to the Audit Committee existed.

10. The Director of Internal Audit must report the audit findings to the Audit Committee, including which findings may relate to the effectiveness and adequacy of the Company's internal controls, risk management and governance processes.

• (Formerly) No formal policy about the Director of Internal Audit's reports to the Audit Committee existed.

11. The Director of Internal Audit must keep the Audit Committee informed of emerging trends in relevant internal control issues and internal audit matters and provide the Audit Committee with a report of outstanding audit issues and the current status of management's efforts to resolve and improve the control environment.

• (Formerly) No formal policy for the Director of Internal Audit's reports to the Audit Committee existed.

12. The Internal Audit Department must keep a log tracking analysis, proposals, and recommendations provided to other departments or management regarding internal controls and accounting and auditing procedures, including the time and place (if applicable) that such information was provided, and any deadlines related thereto.
• (Formerly) None of these requirements existed.

13. The Company must hold an annual meeting of stockholders within forty-five (45) days after the filing of its proxy statement.
• (Formerly) The Company had not previously committed to a timetable for holding its next annual meeting.

14. Revise the Company's Bylaws and Corporate Governance Guidelines to require that the Board maintain standing Audit, Compensation, and Nominating and Governance Committees.
• (Formerly) The Bylaws did not require the Board to maintain any specific standing committees, and the Corporate Governance Guidelines only required that the Board maintain an Audit Committee.

15. The Company must publish on its website all Board committee charters, biographies of the Company's Directors and Officers, and a chart

or list identifying the members of each Board committee publicly available.

• (Formerly) The Company published only two of the three Board Committee charters (with the Nominating and Governance Charter not currently published) on its website. It does not publish biographies of the directors or officers or a listing of the members of each Board Committee on its website.

16. The Company must adopt a formal claw-back policy covering specified incentive compensation of Officers.

• (Formerly) No claw-back policy existed.

17. The Company must ensure that the contact information for its whistleblower hotline and website is conspicuously displayed and widely posted on its website, at the Company's offices and elsewhere, so as to be available to not only employees but also to customers, vendors, and other third parties.

• (Formerly) There was no formal requirement that the whistleblower hotline be posted on the Company's website or that information be widely posted and displayed.

These reforms strike us as substantive and meaningful: they mandate an increased frequency of activity, meetings, and reporting among the company's audit committee, its audit team, outside auditors, and senior leadership. Further, they increase transparency regarding PSI's board of directors,

create a claw-back policy, and enhance the visibility of its whistleblowing mechanisms. It was not an abuse of discretion to approve these measures.

### D. Federal Plaintiff Adequacy

Finally, McFadden briefly posits that the existing federal plaintiffs are inadequate. Federal Rule of Civil Procedure 23.1(a) states that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association."

Because half of the monetary damages went to plaintiffs' counsel, and because the federal plaintiffs stayed the case while a direct class action was in briefing, McFadden claims the plaintiffs failed to adequately represent PSI's shareholders. As to the fees, the district court analyzed the basis and propriety of the amount in extensive detail during the approval hearing. The judge determined that the requested attorneys' fees represented "excellent" work done for two mediation sessions, multiple complaint drafts, motion to dismiss briefing, and pre- and post-complaint research and investigation. The judge also cited the settlement's endorsement by the well-regarded mediator. We find no basis to overturn the judge's thorough review and conclusion, and McFadden does not point to any analytical error. As to the stay of the federal derivative case, McFadden neglects to identify any authority showing that such a delay was unusual, let alone inappropriate.

McFadden raises another point: that the federal plaintiffs do not meet contemporaneous ownership requirements. The

district court found that, because plaintiffs alleged a continuing offense, "they are plaintiffs who can claim damages for owning stock during a period when the company was allegedly engaging in accounting malfeasance." Again, McFadden does not identify any error in the district court's analysis and thus forfeited any relevant argument.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.