# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MATTHEW FISHER, Derivatively on
Behalf of LENDINGCLUB
CORPORATION,

        Plaintiff,

        v.

SCOTT SANBORN, THOMAS W.
CASEY, BRADLEY COLEMAN,
SAMEER GULATI, JOHN C.
MORRIS, DANIEL T. CIPORIN,
SIMON WILLIAMS, TIMOTHY J.
MAYOPOULOS, KENNETH
DENMAN, PATRICIA MCCORD,
LAWRENCE SUMMERS, JEFFREY
CROWE, JOHN J. MACK, and MARY
MEEKER,

        Defendants,

    and

LENDINGCLUB CORPORATION, a
Delaware corporation,

        Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2019-0631-AGB

## MEMORANDUM OPINION

Date Submitted: September 2, 2020
Date Decided: March 30, 2021

Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Brian J.
Robbins, Stephen J. Oddo, Emily R. Bishop, ROBBINS LLP, San Diego, California;
*Attorneys for Plaintiff Matthew Fisher.*

A. Thompson Bayliss, Joseph A. Sparco, ABRAMS & BAYLISS LLP, Wilmington, Delaware; James N. Kramer, Alexander K. Talarides, ORRICK HERRINGTON & SUTCLIFFE LLP, San Francisco, California; *Attorneys for Defendants Scott Sanborn, Thomas W. Casey, Bradley Coleman, Sameer Gulati, John C. Morris, Daniel T. Ciporin, Simon Williams, Timothy J. Mayopoulos, Kenneth Denman, Patricia McCord, Lawrence Summers, Jeffrey Crowe, John J. Mack, Mary Meeker, and Nominal Defendant LendingClub Corporation.*

**BOUCHARD, Chancellor**

A stockholder of LendingClub Corporation asserts in this derivative action that the company's directors breached their fiduciary duty of loyalty and unjustly enriched themselves by utterly failing to implement a board-level monitoring system and consciously disregarding their duty to oversee LendingClub's compliance with consumer protection laws. The impetus behind this claim was a lawsuit the Federal Trade Commission ("FTC") filed against LendingClub in April 2018, alleging it had engaged in unfair and deceptive practices with consumers.

Plaintiff also asserts that the directors breached their fiduciary duty of loyalty by making false and misleading statements about the subject matter of the FTC's investigation, which the company learned about in May 2016, almost two years before the FTC filed suit. In particular, plaintiff alleges that certain of the company's disclosures created the false and misleading impression that the FTC was investigating weaknesses in the company's internal controls, which the company publicly disclosed (coincidentally) in May 2016 after conducting an internal board review and which prompted separate investigations by the United States Department of Justice and the Securities and Exchange Commission.

Defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1 for failure to make a demand on the LendingClub board of directors before filing suit and under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. As to the former issue, plaintiff primarily contends that demand would have

been futile because seven of the eight members of LendingClub's board when the complaint was filed face a substantial likelihood of personal liability for the underlying claims.

The standard under Delaware law for imposing liability on a director exculpated from breaches of the duty of care in a case such as this is an exacting one that requires evidence of bad faith. For the reasons explained below, the court concludes after carefully reviewing the allegations in the complaint and the documents incorporated therein that plaintiff has failed to allege particularized facts from which it reasonably may be inferred that a majority of the directors on LendingClub's board when this action was filed utterly failed to implement a board-level monitoring system, consciously allowed LendingClub to violate consumer protection laws, or knowingly made false and misleading statements. Plaintiff thus has failed to demonstrate that the directors face a substantial likelihood of liability for acting in bad faith so as to excuse his failure to make a demand before filing suit. Accordingly, the complaint will be dismissed with prejudice under Court of Chancery Rule 23.1.

2

## I.  BACKGROUND

Unless otherwise noted, the facts recited in this opinion come from the Verified Second Amended Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment (the "Complaint") and documents incorporated therein, including documents produced to plaintiff in response to an inspection demand under 8 *Del. C.* § 220.[1]

### A.  The Parties

Nominal defendant LendingClub Corporation ("LendingClub" or the "Company") is a Delaware corporation with its principal place of business in San Francisco, California.[2]  LendingClub operates an online lending marketplace platform that connects borrowers with investors willing to fund entire loans, portions of individual loans, or portions of loan pools.[3]  LendingClub uses "issuing bank partners" to originate the loans that it purchases and then services.[4]  The Company

---

[1] Plaintiff agreed that the Complaint "shall be deemed to incorporate by reference the entirety of the books and records" that were produced to him in response to his Section 220 demand.  Transmittal Aff. of Joseph A. Sparco, Esq. ("Sparco Aff.") Ex. A § 1.11 (Dkt. 43).  "In the end, the only effect" of this condition is "to ensure that the plaintiff cannot seize on a document, take it out of context, and insist on an unreasonable inference that the court could not draw if it considered related documents." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016), *abrogated on other grounds*, 214 A.3d 933 (Del. 2019).

[2] Ver. Second Am. S'holder Deriv. Compl. ("Compl.") ¶ 18 (Dkt. 26).

[3] *Id.* ¶ 59.

[4] *Id.*

receives an initial origination fee and subsequent servicing fees from the borrower for its role in facilitating each loan.[5] In 2016 and 2017, origination fees made up "the overwhelming majority" of LendingClub's revenue.[6] Plaintiff Matthew Fisher alleges he has been a LendingClub stockholder continuously since "the time of the wrongdoing complained of" in this action.[7]

The Complaint names as defendants fourteen individuals consisting of eleven current or former members of the Company's board of directors (the "Board") and three current or former officers.[8]

The Board consisted of eight members when this action was filed on August 19, 2019: defendants Scott Sanborn, Daniel T. Ciporin, John C. Morris, Kenneth Denman, Patricia McCord, Simon Williams, and Timothy J. Mayopoulos, and non-party Susan Athey (the "Demand Board").[9] Sanborn, who has been LendingClub's CEO since 2016, is the only employee-director on the Demand Board.[10] Ciporin, Morris, Williams, and Mayopoulos currently serve or previously served on the

---

[5] *Id.*

[6] *Id.* ¶ 63.

[7] *Id.* ¶ 17.

[8] The Complaint also named LendingClub's former CFO Carrie L. Dolan as a defendant. She has since been voluntarily dismissed from the case. Dkt. 38.

[9] Compl. ¶ 191.

[10] *See id.* ¶ 19.

4

Board's Risk Committee.[11] These four directors, along with Denman, also currently serve or previously served on the Board's Audit Committee.[12]

The remaining seven defendants are former LendingClub directors and current or former LendingClub officers. Defendants Lawrence Summers, Jeffrey Crowe, John Mack, and Mary Meeker left the Board before the Complaint was filed.[13] Defendant Thomas W. Casey is LendingClub's CFO.[14] Defendants Sameer Gulati and Bradley Coleman are former officers of the Company.[15]

## B. LendingClub Discloses Material Weaknesses in its Internal Controls Over Financial Reporting

On May 9, 2016, LendingClub disclosed that its then-CEO and Chairman, Renaud Laplanche, had resigned after the Board conducted an internal review that identified "material weaknesses in [its] internal control over financial reporting."[16]

---

[11] Morris and Williams have served on the Risk Committee since at least April 2015. *Id.* ¶¶ 24, 26. Ciporin served on the Risk Committee from at least April 2015 to at least April 2017. *Id.* ¶ 25. Mayopoulos served on the Risk Committee from at least April 2018 to June 2019. *Id.* ¶ 27.

[12] *Id.* ¶¶ 24-28.

[13] Summers, who served on the Risk Committee from at least April 2016 to May 2018, left the Board in May 2018. *Id.* ¶ 30. Crowe, who served on the Audit Committee from at least April 2016 to at least April 2017, left the Board in October 2017. *Id.* ¶ 31. Mack and Meeker both left the Board in June 2019. *Id.* ¶¶ 32-33.

[14] *Id.* ¶ 20.

[15] Gulati served as LendingClub's Chief Operations Officer from May 2016 to December 2018. *Id.* ¶ 23. Coleman served as Corporate Controller, Principal Accounting Officer, and Interim CFO at various times between December 2013 and August 2017. *Id.* ¶ 22.

[16] *Id.* ¶¶ 71, 73, 76 (alteration in original).

The Board review related to "undisclosed self-dealing, sales of nonconforming loans, and backdated loan applications."[17]

The Company's stock price fell 35% in one day on the news.[18] Analysts downgraded LendingClub's stock, citing the Company's "control failures" and need to improve "oversight and compliance related to internal control issues."[19] The United States Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) opened investigations into the Company's business practices.[20] Investors filed lawsuits against the Company, including a derivative action in the Delaware Court of Chancery that later was dismissed under Court of Chancery Rule 23.1.[21]

On May 16, 2016, the Company disclosed the DOJ and SEC investigations in its Form 10-Q for the first quarter of 2016.[22] On August 9, 2016, the Company disclosed additional details concerning its internal control weaknesses in its Form 10-Q for the second quarter of 2016, as follows:

---

[17] *Id.* ¶ 71.

[18] *Id.* ¶ 72.

[19] *Id.*

[20] *Id.*

[21] *See In re LendingClub Corp. Deriv. Litig.*, 2019 WL 5678578 (Del. Ch. Oct. 31, 2019).

[22] Compl. ¶ 75.

*Changes in Internal Control Over Financial Reporting*

During the second quarter of 2016, and in connection with a board review, with the assistance of independent outside counsel and other advisors, regarding specific near-prime loan sales and other compliance matters described elsewhere herein, we identified a material weakness in our internal control over financial reporting. As a result, the Company has concluded that, as of June 30, 2016, the Company's internal control over financial reporting was ineffective.

\* \* \* \* \*

The material weakness relates to the aggregation of control deficiencies in the Company's "tone at the top" and manifested in three primary areas described further below.

\* \* \* \* \*

• **Sales of near-prime loans**: During March and April of 2016, the Company effected sales of $22.3 million of near-prime loans in private transactions with an institutional investor that certain senior managers of the Company apparently were aware were not compliant with a specific non-credit, non-pricing requirement of the investor.

\* \* \* \* \*

• **Review of related party transactions**: The Board did not have the information required to review and approve or disapprove investments made by its former CEO in 2015 and 2016, and a member of its board of directors in 2015, in a holding company for a family of funds (Cirrix Capital, L.P.) that purchases loans and interests in loans from the Company in accordance with Company policies, including the Code of Conduct and Ethics.

\* \* \* \* \*

• **Lack of transparent communication and appropriate oversight of investor contract amendments**: In 2015 and more extensively during the first quarter of 2016, the Company entered into contract amendments with platform investors, related to existing business

7

arrangements. The Company failed in a number of cases to appropriately document or obtain authorizations of these amendments, assess the impact such amendments could have on pre-existing agreements and to communicate these amendments to the appropriate departments.[23]

Over two years later, in September 2018, the Company paid $4 million in a settlement with the SEC.[24] Around the same time, the Company paid $125 million to settle a securities class action lawsuit filed in the United States District Court for the Northern District of California relating to the Company's internal control weaknesses.[25]

## C. The FTC Investigation

Also in May 2016, the same month the Company disclosed material weaknesses in its internal controls, LendingClub received a Civil Investigative Demand ("CID") from the FTC.[26] "A CID is a kind of subpoena . . . that seeks documents or other information related to an FTC investigation."[27] This decision refers to the CID the Company received in May 2016 as the "May 2016 CID."

---

[23] *Id.* ¶ 76 (quoting Form 10-Q for Q2 2016).

[24] *Id.* ¶ 78.

[25] *Id.*

[26] *Id.* ¶ 111.

[27] Transmittal Aff. of Blake A. Bennett ("Bennett Aff.") Ex. A at 2 (Dkt. 47).

By at least September 22, 2016, the Board's Risk Committee was made aware of the May 2016 CID.[28] A presentation to the Risk Committee on that date included the following slide:

- FTC Civil Investigative Demand (CID)
  - Data and information request from Federal Trade Commission
  - Driven by May 9th events and FTC looking at on-line lending and data security; particularly complaints received by FTC regarding LC [LendingClub]
  - LC was working with FTC on advance fee scammers using our name
  - FTC departments did not communicate that complaints were not actually about LC
  - Nearly done with production[29]

On November 9, 2016, the Company disclosed that it had been contacted by the FTC in its Form 10-Q for the third quarter of 2016, as follows:

> On May 9, 2016, following the announcement of the board review described elsewhere in this filing, the Company received a grand jury subpoena from the U.S. Department of Justice (DOJ). The Company was also contacted by the SEC and the Federal Trade Commission ("FTC"). The Company continues cooperating with the DOJ, SEC, FTC and any other governmental or regulatory or agencies. No assurance can be given as to the timing or outcome of these matters.[30]

---

[28] Compl. ¶ 107.

[29] Sparco Aff. Ex. B at LC-Fisher_000802.

[30] LendingClub Corp. Quarterly Report at 36 (Form 10-Q) (Nov. 9, 2016) (quoted at Compl. ¶ 123).

Over the next year, the Company made similar disclosures in its public filings every quarter and in its Form 10-K.[31]  During the same period, the FTC investigation was included as a topic in quarterly presentations to the Board's Risk Committee.[32]

On December 5, 2017, the FTC sent LendingClub a "proposed complaint."[33] A subsequent presentation to the Audit Committee indicated that the filing of the complaint came as a surprise:  "FTC *unexpectedly* sent [a] proposed complaint on 12/5/17 with 5 alleged violations."[34]  On December 13, 2017, the Risk Committee was informed that "[a]fter several months with no contact, FTC's enforcement division reached out to discuss a number of issues, including disclosure of origination fees and concerns about [LendingClub's] privacy policy."[35]

On February 22, 2018, the Company disclosed in its 2017 annual report on Form 10-K that "[t]he FTC Staff [was] investigating questions concerning certain of the Company's policies and practices and related legal compliance" and that the Company had cooperated with "FTC Staff as they evaluate potential claims of

---

[31] Compl. ¶¶ 133 (Form 10-K for 2016), 141 (Form 10-Q for Q1 2017), 149 (Form 10-Q for Q2 2017), 155 (Form 10-Q for Q3 2017).

[32] Sparco Aff. Ex. B at LC-Fisher_000802 (Sept. 22, 2016 Risk Committee presentation), 000849 (Dec. 14, 2016 Risk Committee presentation), 000888 (Mar. 15, 2017 Risk Committee presentation), 000905 (June 28, 2017 Risk Committee presentation), 000922 (Sept. 26, 2017 Risk Committee presentation); *see also* Compl. ¶¶ 107-08.

[33] Compl. ¶ 109.

[34] Sparco Aff. Ex. B at LC-Fisher_001038 (Feb. 7, 2018 Audit Committee presentation) (emphasis added); *see also* Compl. ¶ 109.

[35] Sparco Aff. Ex. B at LC-Fisher_001006; *see also* Compl. ¶¶ 166-67.

deception or unfairness under the FTC Act and other consumer protection laws enforced by the FTC."[36]

## D. The FTC Action

On April 25, 2018, the FTC filed a complaint against LendingClub in the United States District Court for the Northern District of California alleging that the Company had engaged in deceptive and unfair practices in violation of the Federal Trade Commission Act ("FTC Act") and had violated the Gramm-Leach-Bliley Act (the "GLB Act").[37] On the day the FTC action was filed, LendingClub's stock fell by approximately 15%.[38]

On October 22, 2018, the FTC filed an amended complaint asserting four claims.[39] Counts I and II of the amended complaint in the FTC action allege that LendingClub engaged in deceptive practices by (i) promising consumers there would be "no hidden fees" on their loans but then charging origination fees that were deducted from the specified loan amount[40] and (ii) misleading consumers about whether their loan applications have been approved when LendingClub knew many

---

[36] Compl. ¶ 163 (quoting 2017 Form 10-K).

[37] *Id.* ¶¶ 169-171.

[38] *Id.* ¶¶ 12, 173.

[39] *Id.* ¶ 8 n.2; Sparco Aff. Ex. C ¶¶ 56-67.

[40] Sparco Aff. Ex. C ¶¶ 10, 56-58.

11

such consumers would never receive a loan.[41]  Count III alleges that LendingClub engaged in unfair practices by withdrawing double payments from some consumers' accounts and continuing to charge customers who cancelled automatic payments or paid off their loans.[42]  Count IV alleges that LendingClub failed to provide consumers with clear and conspicuous privacy notices in violation of the Privacy Rule and Reg. P of the GLB Act.[43]

LendingClub disputes and has defended itself vigorously against all of the claims in the FTC action.[44]  On June 1, 2020, in a lengthy decision addressing several motions, the district court in the FTC action (i) denied the FTC's motion for summary judgment on Counts I and IV; (ii) granted in part (as to certain representations) the FTC's motion for summary judgment on Count II; (iii) denied the parties' cross-motions for summary judgment on Count III; and (iv) granted the Company's cross-motion for summary judgment on Count IV as to the relief sought and dismissed Count IV as moot for lack of an available remedy.[45]

---

[41] *Id.* ¶¶ 10, 59-61.

[42] *Id.* ¶¶ 10, 62-64.

[43] *Id.* ¶¶ 51, 65-67.

[44] *See generally* Sparco Aff. Ex. D.

[45] *Federal Trade Comm'n v. LendingClub Corp.*, 2020 WL 2838827, at \*17, \*21, \*22, \*24, \*37 (N.D. Cal. June 1, 2020).

On August 20, 2020, the district court stayed all proceedings in the FTC action pending a decision on a case presently before the United States Supreme Court.[46] In that case, the Supreme Court is asked to decide whether Section 13(b) of the FTC Act permits the FTC to seek monetary relief for past violations. In granting the stay, the district court explained that "LendingClub has ceased virtually all of the conduct at issue in [the FTC action]" and "the only issue remaining is the FTC's recovery of restitution" under Section 13(b).[47] The district court reasoned that "[g]oing forward with trial would needlessly burden LendingClub to put on a trial defense only to possibly have the entire enterprise mooted by the FTC's inability to seek any monetary relief under Section 13(b)" and that "exposing LendingClub to the risk of a monetary judgment when the ability of the FTC to collect such a judgment at all is pending review—and could be rendered moot by the Supreme Court—is fundamentally inequitable."[48] The stay remains in place.

---

[46] *See AMG Capital Mgmt., LLC v. Federal Trade Comm'n,* 141 S. Ct. 194 (2020) (granting certiorari).

[47] *Federal Trade Comm'n v. LendingClub Corp.*, 2020 WL 4898136, at *2 (N.D. Cal. Aug. 20, 2020).

[48] *Id.* at *3.

## E. The Securities Action

On May 2, 2018, one week after the filing of the FTC action, stockholders of LendingClub filed a securities class action in the United States District Court for the Northern District of California on behalf of purchasers of LendingClub stock between May 9, 2016 and April 25, 2018 (the "Securities Action").[49] The crux of the Securities Action, as pleaded in a consolidated amended complaint, "was that LendingClub misled investors by failing to disclose the alleged deceptive consumer-facing practices charged in the FTC Complaint."[50] On November 4, 2019, the district court dismissed the consolidated amended complaint but granted plaintiffs leave to amend.[51]

On December 12, 2019, plaintiffs filed a second amended complaint against LendingClub and three of its officers (Sanborn, Coleman, and Casey), alleging they violated Sections 10(b) of the Securities Exchange Act and Rule 10b-5 and that the individual defendants violated Section 20(a) of the Securities Exchange Act as "controlling persons" of LendingClub.[52] The second amended complaint alleged a "completely different theory of liability" than the prior complaint, namely that:

---

[49] *Veal v. LendingClub Corp.*, 2020 WL 3128909, at *1 (N.D. Cal. June 12, 2020).

[50] *Id.* at *3.

[51] *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 819 (N.D. Cal. 2019).

[52] *LendingClub Corp.*, 2020 WL 3128909, at *1, *3, *16.

14

Defendants made false or misleading statements because (1) Defendants first failed to disclose the FTC Investigation that started in May 2016 and (2) when, in November 2016, Defendants finally disclosed that the FTC was investigating the Company, they misled the investors by lumping together all regulatory investigations, and omitting that the FTC Investigation involved wholly distinct conduct from the Board Review.[53]

On June 12, 2020, the district court granted defendants' motion to dismiss the second amended complaint in its entirety, holding, among other things, that the complaint failed to plead a false or misleading statement or that defendants acted with scienter.[54] This decision is on appeal in the United States Court of Appeals for the Ninth Circuit.

## II. PROCEDURAL HISTORY

On August 12, 2019, plaintiff filed his initial complaint in this action, which he amended twice in the face of dismissal motions. The operative Complaint contains two counts.

Count I asserts essentially three different claims for breach of fiduciary: (i) an oversight claim under *Caremark*[55] and its progeny against all defendants, (ii) a

---

[53] *Id.* at *3. The term "Board Review" refers to the Company's May 2016 disclosure of "the circumstances related to the internal control weaknesses" and its summary of "a 'board review' of those circumstances." *Id.* at *2.

[54] *Id.* at *6-17. On August 11, 2020, plaintiffs in federal derivative actions asserting state law and federal disclosure claims "based on substantially the same alleged misstatements at issue" in the Securities Action stipulated to a voluntary dismissal of their cases "in light of the dismissal of the Securities Action." Dkt. 57 Ex. A at 2.

[55] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

disclosure claim against all defendants, which plaintiff "cut and paste some" from the second amended complaint in the Securities Action,[56] and (iii) an insider trading claim under *Brophy*[57] and its progeny against six of the defendants—Sanborn, Casey, Dolan, Coleman, Gulati, and Williams—for selling LendingClub shares at various times between June 2016 and November 2017.[58]

Count II asserts a claim for unjust enrichment against all defendants on the theory that they "were unjustly enriched as a result of the compensation and director remuneration they received while breaching their fiduciary duties owed to LendingClub."[59] Count II also asserts that the targets of the *Brophy* claim "were unjustly enriched through their exploitation of material and adverse inside information."[60]

On March 30, 2020, defendants moved to dismiss both claims under Court of Chancery Rule 23.1 for failure to make a demand on the Board before filing suit and under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. The matter was fully submitted on September 2, after the receipt of supplemental filings.

---

[56] Oral Arg. Tr. at 31 (Feb. 26, 2020) (Dkt. 42).

[57] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

[58] Compl. ¶¶ 177-83, 205.

[59] *Id.* ¶ 209.

[60] *Id.* ¶ 210.

## III. ANALYSIS

During oral argument, plaintiff's counsel appropriately made two concessions: (i) that demand was not excused under Court of Chancery Rule 23.1 for the *Brophy* claim in Count I, which is asserted against only two of the eight directors on the Demand Board, and (ii) that the viability of the unjust enrichment claim in Count II would rise or fall on whether the oversight and disclosure claims in Count I survive.[61]  For the reasons explained below, the court concludes that demand was not excused under Rule 23.1 for either the oversight claim or the disclosure claim, which thus must be dismissed.  Accordingly, the Complaint will be dismissed in its entirety under Rule 23.1 and the court does not need to reach defendants' 12(b)(6) arguments.

### A.    Legal Standard Governing Demand Futility

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[62]  Because

---

[61] Mot. to Dismiss Hr'g Tr. at 80-81 (July 2, 2020) (Dkt. 56).  The transcript contains an obvious typographical error on page 81 where the word "not" inadvertently was omitted from the first concession.  *See id.* ("So moving on to the *Brophy* claim, after further analysis of the recent *GoPro* decision and the realization that our facts are very similar to what was alleged in *GoPro* and where the *Brophy* claim was disallowed, plaintiff is willing to concede that demand would [not] be futile on that claim.").

[62] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

derivative litigation "impinges on the managerial freedom of directors,"[63] it is the responsibility of the board of directors to decide whether to bring derivative claims in the first instance.[64] This approach "is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit."[65]

Court of Chancery Rule 23.1 embodies these principles. It requires that a stockholder plaintiff wishing to pursue derivative claims on behalf of the corporation "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[66] In other words, the plaintiff must either make demand on the board or allege that making demand on the board would have been futile.

Rule 23.1 carries heightened pleading requirements. Stockholders choosing to forego making a demand "must comply with stringent requirements of factual particularity."[67] "Rule 23.1 is not satisfied by conclusory statements or mere notice

---

[63] *Id.*

[64] *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990).

[65] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds,* 473 A.2d 805 (Del. 1984).

[66] Ct. Ch. R. 23.1.

[67] *Brehm*, 746 A.2d at 254.

pleading."[68]    Instead, the plaintiff "must set forth . . . particularized factual statements that are essential to the claim."[69]

"Demand futility under Rule 23.1 must be determined pursuant to either the standards articulated in *Aronson v. Lewis* or those set forth in *Rales v. Blasband*."[70] The court applies the *Aronson* test when "a decision of the board of directors is being challenged in the derivative suit."[71] The court applies the *Rales* test when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as "where directors are sued derivatively because they have failed to do something."[72]    Under either test, a plaintiff "must impugn the ability of at least half the directors in office when [plaintiff] initiated [its] action . . . to have considered a demand impartially."[73]

---

[68] *Id.*

[69] *Id.*

[70] *Braddock v. Zimmerman*, 906 A.2d 776, 784-85 (Del. 2006) (citing *Aronson*, 473 A.2d 805 and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993)).

[71] *Rales*, 634 A.2d at 933.

[72] *Id.* at 933-34 & n.9.  The *Rales* test also applies "where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced" and where "the decision being challenged was made by the board of a different corporation."  *Id.* at 934.

[73] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015).

"Demand futility analysis is conducted on a claim-by-claim basis."[74] The *Rales* test applies to "alleged violations of the board's oversight duties."[75] The court also will apply the *Rales* test to the disclosure claim because it implicates the Board's oversight over statements made in the Company's public filings and during an investor call.[76] Thus, the court will apply the *Rales* test to both to oversight and disclosure claims in Count I.[77]

Under *Rales*, a plaintiff successfully pleads demand futility only if "the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[78] "A

---

[74] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004).

[75] *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017).

[76] *See Steinberg v. Bearden*, 2018 WL 2434558, at *5, *8 (Del. Ch. May 30, 2018) (applying *Rales* test to claim that directors and officers breached their fiduciary duties "by making, allowing, or failing to correct [certain] materially false and misleading misrepresentations and omissions"); *Sandys v. Pincus*, 2016 WL 769999, at *14-15 (Del. Ch. Feb. 16, 2016) (citing *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) and *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *6 n.25 (Del. Ch. Jan. 11, 2010)) (applying *Rales* test to claim that director defendants "failed to disclose material information to the public"), *rev'd on other grounds*, 152 A.3d 124 (Del. 2016).

[77] As many members of this court have commented, it ultimately is inconsequential whether the *Aronson* or *Rales* test applies since both tests functionally take into account the same considerations. For this reason, our law would be well-served to use *Rales* as the general test. *See United Food & Commercial Workers Union v. Zuckerberg*, 2020 WL 6266162, at *9-18 (Del. Ch. Oct. 26, 2020).

[78] *Rales*, 634 A.2d at 934.

20

director cannot exercise . . . independent and disinterested business judgment where [the] director is either interested in the alleged wrongdoing or not independent of someone who is."[79]

The Demand Board consists of eight directors. Plaintiff does not challenge the impartiality of non-party director Athey. Thus, the question before the court is whether plaintiff has plead with particularity sufficient facts to create a reasonable doubt about the disinterestedness or independence of four of the other seven members of the Demand Board.

Plaintiff primarily argues that a majority of the Demand Board members are interested because they face a substantial likelihood of liability with respect to the oversight and disclosure claims asserted in the Complaint.[80] It is black-letter law that "the mere threat of personal liability . . . is insufficient to challenge either the

---

[79] *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *15 (Del. Ch. Aug. 24, 2020) (internal quotation marks omitted).

[80] Plaintiff also asserts that Sanborn lacks independence from the other directors on the Demand Board because they control the substantial amount of compensation he receives as the Company's CEO. *See* Pl.'s Answering Br. at 55-57 (Dkt. 47). It is not necessary to reach this issue because Sanborn is just one of eight Demand Board directors and thus the issue of demand futility will turn on whether four of them face a substantial likelihood of personal liability.

independence or disinterestedness of directors."[81]  Rather, "a majority of the board must face a 'substantial likelihood' of personal liability for demand to be excused."[82]

LendingClub's certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care, as permitted under Section 102(b)(7) of the Delaware General Corporation Law.[83]  Thus, to demonstrate demand futility, Plaintiff must allege with particularity facts demonstrating that at least half of the directors on the Demand Board face a substantial likelihood of liability with respect to a claim for breach of the duty of loyalty.  With the foregoing principles in mind, the court considers the sufficiency of the Complaint's allegations with respect to the oversight and disclosure claims, in turn, below.

### B. The Complaint Fails to Allege Facts Sufficient to Show that a Majority of the Demand Board Faces a Substantial Likelihood of Liability under *Caremark*

Oversight liability under *Caremark* "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[84]  To plead a substantial likelihood of liability under *Caremark*, a stockholder must allege

---

[81] *Aronson*, 473 A.2d at 815.

[82] *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *6 (Del. Ch. Aug. 1, 2016) (quoting *Aronson*, 473 A.2d at 815).

[83] Sparco Aff. Ex. H art. VII § 1.  Certificates of incorporation are judicially noticeable.  *In re Wheelabrator Techs. Inc. S'holder Litig.*, 1992 WL 212595, at *11-12 (Del. Ch. Sept. 1, 1992).

[84] *Caremark*, 698 A.2d at 967.

particularized facts sufficient to show that (1) "the directors utterly failed to implement any reporting or information system or controls," or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of the risks or problems requiring their attention."[85]  Either prong of *Caremark* "requires a showing that the directors knew that they were not discharging their fiduciary obligations."[86]  This scienter requirement follows not only from *Caremark* itself, but from the existence of exculpatory provisions such as the one in LendingClub's certificate of incorporation.[87]

Plaintiff argues that a majority of the Demand Board faces a substantial likelihood of liability with respect to both prongs of *Caremark*.  The court considers next the Complaint's allegations relevant to each category.

### 1.    The First *Caremark* Prong

In discussing the first prong of *Caremark*, the Delaware Supreme Court explained in *Marchand v. Barnhill* that "directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources.  But *Caremark* does have a bottom-line requirement that is important:

---

[85] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[86] *Id.*

[87] *Reiter v. Fairbank*, 2016 WL 6081823, at *7 (Del. Ch. Oct. 18, 2016).

the board must make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting."[88] The high court further observed that, "[i]n decisions dismissing *Caremark* claims, the plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants."[89] That is the case here.

Plaintiff argues that a majority of the Demand Board faces a substantial likelihood of personal liability because "there were no procedures to detect issues critical to the Company's functioning."[90] But the Complaint tells a different story.

The Complaint acknowledges, as it must, that LendingClub had board-level reporting systems in place. In addition to having an Audit Committee,[91] the Board

---

[88] 212 A.3d 805, 821 (Del. 2019) (Strine, C.J.) (citations omitted).

[89] *Id.* at 823.

[90] Pl.'s Answering Br. at 37. In the same paragraph, plaintiff's brief asserts that a June 2015 presentation to the Risk Committee "warned" that "'[a]ctions likely to cause significant reputational risk do not get proper Management and/or Board review and approval.'" *Id.* at 37-38 (quoting Sparco Aff. Ex. B at LC-Fisher_001443). This is a gross mischaracterization. The quote from the presentation on which plaintiff relies was not a factual finding about the Board's oversight performance, but rather an explanatory statement used to define one of the risks (*i.e.*, "reputational risk") that the Risk Committee was monitoring. *See* Sparco Aff. Ex. B at LC-Fisher_001443. Indeed, the presentation indicates that this risk, as measured by the "Number of Type I and II Complaints per 1,000 issued loans," was a "low risk" that had decreased between March and April 2015. *Id.*

[91] Compl. ¶¶ 42-44.

established a separate Risk Committee to, among other things, (i) "oversee the Company's risk management structure," (ii) "oversee the Company's risk management and risk assessment guidelines and policies regarding[] credit, operational, technology, security, legal, and compliance risk," (iii) "monitor the Company's enterprise risk management plan," and (iv) "monitor and evaluate the performance of the Company's risk management function."[92]

The Risk Committee was tasked to "review at least quarterly the major risk exposures of the Company and its business units," including compliance risk, and to receive reports from the Company's Chief Risk Officer "at least quarterly" concerning the "results of risk management reviews and assessments."[93] It also was required to receive "reports and recommendations from management and the Company's internal Management Risk Committee on risk tolerance."[94]

Contrary to the notion that the Company lacked a board-level reporting system, the Complaint specifically alleges that the Risk Committee was "routinely apprised of mounting complaints from consumers."[95] On March 22, 2016, for example, a slide deck covering "Complaints Monitoring and Trending" was

---

[92] *Id.* ¶ 45 (internal quotation marks omitted).

[93] *Id.*

[94] *Id.* ¶ 46.

[95] *Id.* ¶ 99.

presented to the Risk Committee.[96] That presentation contained a break-down of consumer complaints by category, summarized complaint trends, and noted on a slide titled "Actively managing key drivers of complaint volume" that the Company had implemented or was in the process of implementing systems to address issues giving rise to consumer complaints.[97] The Complaint alleges the Risk Committee received similar presentations concerning consumer complaint volume in June 2017,[98] September 2017,[99] and December 2017.[100]

The Complaint further alleges that "[t]he Risk Committee was routinely updated on the FTC's investigation."[101] On September 22, 2016, for example, the Risk Committee received a "Legal Risk Updates" presentation discussing the Company's receipt of the May 2016 CID from the FTC.[102] The presentation explained that the CID was "[d]riven by [the] May 9th events"—referring to the disclosure of a Board review that identified material weaknesses in the Company's

---

[96] *Id.*; Sparco Aff. Ex. B at LC-Fisher_000791-92.

[97] Sparco Aff. Ex. B at LC-Fisher_000793-95.

[98] Compl. ¶ 103; Sparco Aff. Ex. B at LC-Fisher_000904-11 (presentation covering "Consumer Complaint Activity" from March 1, 2017 to April 30, 2017).

[99] Compl. ¶¶ 104-05; Sparco Aff. Ex. B at LC-Fisher_000921-29 (presentation covering "Consumer Complaint Activity" from May 1, 2017 to August 31, 2017).

[100] Compl. ¶ 106; Sparco Aff. Ex. B at LC-Fisher_001002-12 (presentation covering "Consumer Complaint Activity" from September 1, 2017 to October 31, 2017).

[101] Compl. ¶ 108.

[102] Compl. ¶ 107; Sparco Aff. Ex. B at LC-Fisher_000802 (Sept. 22, 2016 Risk Committee presentation).

internal controls—and that the FTC was "looking at on-line lending and data security; particularly complaints received by [the] FTC regarding [LendingClub]."[103] The May 2016 CID was referenced in quarterly Risk Committee presentations over the next five quarters.[104] Plaintiff's own brief concedes that the "Demand Board was well aware of the [FTC] investigation, received detailed reports on the investigation, and routinely discussed the investigation."[105]

As this court has explained, our Supreme Court was quite deliberate in its use of the adverb "utterly"—a "linguistically extreme formulation"—to set a high bar when articulating the standard to hold directors personally liable for a failure of oversight under the first *Caremark* prong.[106] Given the factual allegations from the Complaint just recited, it reasonably cannot be said that the LendingClub's directors "utterly failed to implement any reporting or information system or controls"[107] relevant to monitoring compliance with consumer protection laws or, in the words

---

[103] Compl. ¶ 107; Sparco Aff. Ex. B at LC-Fisher_000802.

[104] Compl. ¶¶ 108, 166; Sparco Aff. Ex. B at LC-Fisher_000849 (Dec. 14, 2016 meeting); 000888 (Mar. 15, 2017 meeting); 000905 (June 28, 2017 meeting); 000922 (Sept. 26, 2017 meeting); 001006 (Dec. 13, 2017 meeting).

[105] Pl.'s Answering Br. at 43; *see also id.* at 13 ("In 2017, the Director Defendants discussed the FTC's investigation on several occasions.").

[106] *Horman v. Abney*, 2017 WL 242571, at *8 n.46 (Del. Ch. Jan. 19, 2017) ("'Utterly failed' is a linguistically extreme formulation.") (quoting Bradley R. Aronstam & David E. Ross, *Retracing Delaware's Corporate Roots Through Recent Decisions: Corporate Foundations Remain Stable While Judicial Standards of Review Continue to Evolve*, 12 Del. L. Rev. 1, 13 n.73 (2010)).

[107] *Stone*, 911 A.2d at 370.

of *Marchand*, that they made no good faith effort to "try."[108]  Accordingly, plaintiff has failed to allege facts to support a reasonable inference that any members of the Demand Board are exposed to a substantial likelihood of liability under the first *Caremark* prong so as to excuse plaintiff's failure to make a demand.[109]

## 2. The Second *Caremark* Prong

To establish liability under the second *Caremark* prong, "a complaint must allege (1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation."[110]  To meet this pleading burden, plaintiffs typically allege facts demonstrating that the directors were alerted to "evidence of illegality—the

---

[108] *Marchand*, 212 A.3d at 821.

[109] The facts here do not come close to the allegations indicating a lack of board-level systems or controls in the two cases on which plaintiff relies.  In *Marchand*, where food safety was "essential and mission critical" to the company, the complaint alleged, among other things, that "no board committee that addressed food safety existed," "no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed" and "the board meetings [were] devoid of any suggestion that there was any regular discussion of food safety issues."  212 A.3d at 822-24.  In *Inter-Marketing Group USA, Inc. v. Plains All American Pipeline, L.P.*, which involved an oil spill caused by corrosion in the company's pipelines, the complaint included testimony from the company's CEO in a parallel criminal proceeding that the board did not establish a subcommittee responsible for overseeing pipeline integrity and "did not discuss pipeline integrity policy or procedure" generally, and that "decisions regarding pipeline integrity were made at lower levels of the company" rather than at the board level. 2020 WL 756965, at *12-13 (Del. Ch. Jan. 31, 2020).

[110] *In re Qualcomm Inc. FCPA S'holder Deriv. Litig.*, 2017 WL 2608723, at *2 (Del. Ch. June 16, 2017) (internal quotation marks and citation omitted).

proverbial 'red flag,'" yet acted in bad faith by consciously disregarding their duty to address that misconduct.[111] "Under Delaware law, red flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'"[112]

Plaintiff argues that the Demand Board faces a substantial likelihood of liability under the second prong of *Caremark* because the Board was "presented with evidence LendingClub was deceiving borrowers and violating the law, and the Board did nothing in response."[113] For support, plaintiff points to two purported red flags: (i) that "the FTC initiated an investigation" of LendingClub in May 2016, which the Board "routinely discussed," and (ii) that the Demand Board "received presentations showing an increasing number of Origination Complaints from customers."[114]

---

[111] *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012).

[112] *Wood*, 953 A.2d at 143 (quoting *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003)).

[113] Pl.'s Answering Br. at 43.

[114] *Id.* The Complaint alleges that internal memoranda from LendingClub's compliance team and an email from a LendingClub investor's counsel warned of potential problems with the Company's consumer practices. *See, e.g.*, Compl. ¶¶ 82, 83, 84, 97. Plaintiff's brief does not assert that these communications were brought to the Board's attention so as to constitute red flags, thus waiving the issue. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.") (citations omitted). In any event, the Complaint contains no factual allegations indicating that any member of the Demand Board received or was made aware of these communications—a necessary predicate to pleading the existence of red flag. *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *21 (Del. Ch. Dec. 8, 2017) (finding that "the Complaint does not say whether these issues were brought to the defendants' attention," which "prevents them from serving as red flags").

29

Although the FTC "sometimes sends CIDs to obtain information from others who are not the subjects of investigation,"[115] it is reasonable to infer the Risk Committee understood that LendingClub was the target of an FTC investigation at least by September 2016. That is when the Risk Committee received a presentation indicating the FTC had received "complaints . . . regarding [LendingClub]" and "did not communicate that [the] complaints were not actually about [LendingClub]."[116]

The issuance of a subpoena or the launch of a regulatory investigation does not "necessarily demonstrate that a corporation's directors knew or should have known that the corporation was violating the law."[117] "When such events become a

---

[115] Bennett Aff. Ex. A at 2.

[116] Sparco Aff. Ex. B at LC-Fisher_000802.

[117] *Rojas*, 2019 WL 3408812, at *11; *see also In re Universal Health Servs., Inc. Deriv. Litig.*, 2019 WL 3886838, at *37 (E.D. Pa. Aug. 19, 2019) (holding that "the fact that the government opened an investigation into UHS for potential violations of the False Claims Act does not mean that the company actually violated the False Claims Act or that the Board knew that any violations occurred"); *Kococinski v. Collins*, 935 F. Supp. 2d 909, 924 (D. Minn. 2013) (ruling that "the fact that the Board may have known that [a government] investigation was underway does not support an inference that the Board actually knew that illegal conduct was occurring"); *In re Chemed Corp., S'holder Deriv. Litig.*, 2015 WL 9460118, at *18 (D. Del. Dec. 23, 2015) (finding that subpoenas "alleging" wrongdoing are "certainly something to be taken into consideration along with a plaintiff's other red flag allegations" but receipt of subpoenas "do not on their own suggest that a board was aware of corporate misconduct—they suggest only that the board was aware that the company was under investigation") (alterations and internal quotation marks omitted). *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 175 (D. Del. 2009) (explaining that "the Court does not place great weight on a 'preliminary' finding of [a government investigation] and therefore cannot conclude that the directors now face a 'substantial likelihood' of liability for having allegedly ignored the [] investigation").

'red flag' depends on the circumstances."[118] If a plaintiff is able to "present[] strong factual allegations of *board knowledge of ongoing legal violations* in the wake of federal government enforcement proceedings," for example, then the mere fact of a regulatory investigation would take on more significance at the pleading stage.[119]

Plaintiff suggests the May 2016 CID constituted a red flag that LendingClub was violating the law in the manner alleged in the complaint the FTC filed against the Company almost two years later, in April 2018.[120] For whatever reason, plaintiff did not obtain a copy of the May 2016 CID before filing this action as part of his books and records inspection,[121] and thus the Complaint does not describe the specific subject matter for which the FTC sought documents from the Company or any other contents of the May 2016 CID that may have shed light on the nature of the FTC's investigation at that point. As such, plaintiff has failed to plead with particularity that, even if the Demand Board had reviewed the May 2016 CID, the

---

[118] *Rojas*, 2019 WL 3408812, at *11.

[119] *Id.* (collecting cases).

[120] *See* Pl.'s Answering Br. at 8, 26, 43.

[121] Mot. to Dismiss Hr'g Tr. at 91 (July 2, 2020) (Dkt. 56).

Demand Board would or should have known at the time that the Company was violating the law.[122]

Working from what the Complaint does allege, there are no particularized factual allegations indicating that the FTC warned LendingClub it was violating the law *before December 5, 2017*. That is when, as stated in a February 7, 2018 presentation to the Audit Committee, the "FTC *unexpectedly* sent [a] proposed complaint on 12/5/17 with 5 alleged violations."[123] Previous presentations made to

---

[122] On August 24, 2020, after oral argument in this case, Vice Chancellor Glasscock found it reasonable to infer that the directors of AmerisourceBergen Corporation were aware of allegations in a *quit tam* action filed by its former COO and the contents of a Department of Justice subpoena based on the directors having signed annual reports on Form 10-K disclosing the *quit tam* action and the subpoena. *Chou*, 2020 WL 5028065, at *21, *24. Importantly, the specific contents of the *qui tam* complaint, which alleged that the company was engaged in illegal activity, and of the subpoena were detailed in the complaint. *See id.* at *8, *13.

In a supplemental submission, plaintiff cites *Chou* as "relevant to Plaintiff's argument that the board of directors . . . was aware of the allegations underlying the Federal Trade Commission's investigation." Dkt. 59 at 2. The implication of the submission is that the court should infer that the directors on the Demand Board who signed a Form 10-K disclosing the May 2016 CID were aware of the contents of that document. Even if the court were to draw such an inference, however, it would not aid plaintiff because in this case, unlike in *Chou*, the contents of the May 2016 CID are not alleged in the Complaint. Indeed, contrary to plaintiff's suggestion that the May 2016 CID would show that the FTC believed LendingClub was violating consumer protection laws, documents cited in the Complaint indicate that the Company believed the May 2016 CID was "[d]riven by [the] May 9th events" that related to the Board review that identified material weaknesses in the Company's internal controls. *See, e.g.*, Sparco Aff. Ex. B at LC-Fisher_000802 (Sept. 22, 2016 Risk Committee presentation), 000849 (Dec. 14, 2016 Risk Committee presentation), 000888 (Mar. 15, 2017 Risk Committee presentation) (cited at Compl. ¶¶ 107-08).

[123] Sparco Aff. Ex. B at LC-Fisher_001038 (Feb. 7, 2018 Audit Committee presentation) (emphasis added); *see* Compl. ¶ 109.

the Risk Committee on a quarterly basis, quoted below, referenced the FTC investigation but without providing any specific indication the FTC believed the Company was violating the law:

- In September 2016, December 2016, and March 2017, the Risk Committee was informed that the May 2016 CID was "[d]riven by May 9th events and [the] FTC looking at on-line lending and data security; particularly complaints received by FTC regarding [LendingClub]."[124]

- In June 2017 and September 2017, the Risk Committee was informed that the Company was "continuing to cooperate" with the FTC and that there were "no significant developments since [the] last update."[125]

On December 13, 2017, shortly after the FTC sent LendingClub the proposed complaint, the Risk Committee was informed that "[a]fter several months with no contact, FTC's enforcement division reached out to discuss a number of issues, including disclosure of origination fees and concerns about our privacy policy" and that Company representatives "will be meeting with representatives [of the FTC] to discuss in detail."[126] Several months later, in April 2018, the FTC formally filed suit against LendingClub alleging that it had engaged in deceptive and unfair

---

[124] Sparco Aff. Ex. B at LC-Fisher_000802 (Sept. 22, 2016 Risk Committee presentation); 000849 (Dec. 14, 2016 Risk Committee presentation); 000888 (Mar. 15, 2017 Risk Committee presentation); *see* Compl. ¶¶ 107-08.

[125] Sparco Aff. Ex. B at LC-Fisher_00905 (June 28, 2017 Risk Committee presentation), 000922 (Sept. 26, 2017 Risk Committee presentation); *see* Compl. ¶ 108.

[126] Sparco Aff. Ex. B at LC-Fisher_001006 (Dec. 13, 2017 Risk Committee presentation); *see* Compl. ¶¶ 109, 166.

practices.[127]  As discussed in Part I.D, LendingClub denies any wrongdoing in the FTC action and has defended itself against the FTC's claims vigorously since the action was filed.

Tacitly recognizing that the Risk Committee's knowledge of the FTC's investigation before the Company received a draft complaint from the FTC in December 2017 is insufficient by itself to serve as a red flag of illegal activity, plaintiff argues that the Board's awareness of the investigation "coupled with consumer complaints" during this period "was sufficient to put the Board on notice that LendingClub was violating the law."[128]  For support, plaintiff identifies four presentations allegedly "showing an increasing number of Origination Complaints from customers" that were made to the Risk Committee on March 22, 2016, June 28, 2017, September 26, 2017, and December 13, 2017.[129]  None of these presentations, however, allege facts sufficient to support a reasonable inference that any member of the Risk Committee knew that LendingClub was violating the law.

Plaintiff focuses primarily on the March 22, 2016 presentation, which showed that "origination complaints" increased from 0.15 per 1,000 applications in the fourth quarter of 2015 to 0.20 per 1,000 applications in the first quarter of 2016 after

---

[127] Compl. ¶¶ 169-171.

[128] Pl.'s Answering Br. at 48.

[129] *Id.* at 43 (citing Compl. ¶¶ 99, 103-06).

LendingClub allegedly "increased the prominence of the 'No hidden fees' representation and decreased the prominence of the tooltip."[130] Significantly, the slide presenting these data explains that the "[r]elative increase in complaint volume [was] driven by internal Operations awareness training."[131] The March 2016 presentation also reported that (i) Level 1[132] Personal Loan complaint volume actually "fell as a percentage of Applications and Originations,"[133] (ii) the volume of externally reported complaints remained "lower or equal relative to [LendingClub's] peers,"[134] and (iii) management determined there were "no major trends or issues across channels"[135] and was "actively managing key drivers of complaint volume."[136]

The Complaint alleges that the June 28, 2017 presentation "stated that 'Level 3 complaints increased significantly'" and that "prelisting complaints 'increase[d] in

---

[130] *Id.* at 44; Sparco Aff. Ex. B at LC-Fisher_000795.

[131] Pl.'s Answering Br. at 43-44 (citing Sparco Aff. Ex. B at LC-Fisher_000795); *see also* Sparco Aff. Ex. B at LC-Fisher_000793 ("Personal Loan complaint volume increased relative to business volume as we conducted internal awareness training").

[132] "Complaints that are externally reported by a regulatory agency or the Better Business Bureau are categorized as Level 1, as well as internally reported complaints concerning fair lending or discrimination, fraud, and UDAAP." Compl. ¶ 10 n.4 (citing LC-Fisher_000897).

[133] Sparco Aff. Ex. B at LC-Fisher_000795.

[134] *Id.* at LC-Fisher_000793.

[135] *Id.* at LC-Fisher_000798.

[136] *Id.* at LC-Fisher_000793.

volume in relation to number of applications.'"[137]  As to the first point, the presentation actually stated that "Level 3 complaints increased significantly" due to the fact that "advance fee scammers" had been misrepresenting themselves as LendingClub.[138]  In fact, the presentation reported that complaints relating to advance fee scammers comprised 50% of the Company's complaint volume.[139]  As to the second point, the presentation explained that the Company was "researching [the] root cause(s)" for the increase in volume of "prelisting complaints" and "any potential compliance issues with [the] Marketing and Compliance teams."[140]

The Complaint alleges that the September 26, 2017 presentation "noted that the '[v]olume of complaints as a percentage of key metrics . . . [is] trending upwards,'" that "the '[a]verage monthly volume of Level 1 complaints has doubled,'" and "that '[a]pproximately 10% of Level 1 complaints [were] deemed substantiated (all UDAAP related).'"[141]  The Complaint further alleges that the

---

[137] Compl. ¶ 103.  "Level 3" complaints include "failure to follow established procedures, process deficiency, threat of litigation, threat to file a complaint with a regulatory agency, and those involving a specific consumer detriment that does not meet the standards for Tier 1 or Tier 2."  *Id.* ¶ 103 n.6.

[138] Sparco Aff. Ex. B at LC-Fisher_000909; *see id.* at LC-Fisher_000908 ("As of April 1, Advance Fee Scam (AFS) cases are tracked as complaints."); *see also id.* at LC-Fisher_000802 ("LC was working with FTC on advance fee scammers using our name").

[139] *Id.* at LC-Fisher_000908.

[140] *Id.* at LC-Fisher_000909.

[141] Compl. ¶¶ 104-05 (citing LC-Fisher_000927, 000929).  "UDAAP" is an acronym that describes claims for "Unfair, Deceptive, and Abusive Acts or Practices" under the Dodd-Frank Wall Street Reform and Consumer Protection Act.  *Id.* ¶ 9 n.3.

presentation "lists sales, marketing, and advertising as one of the '[t]op 5 reasons for complaints'" received between May and August 2017 and "that the 'spike' in this category was 'driven by pre-screen complaints (borrower received pre-approval marketing material, then denied).'"[142]

The September 2017 presentation explained, however, that the increase in Level 1 complaint volume did "not appear to be a systemic breakdown in [LendingClub] processes" and, rather, was "attributable to the . . . refresher training provided to [the Company's consumer advocacy team] by [the compliance team] for UDAAP and Fair Lending in an ongoing effort to hone classification of complaints"[143] and efforts to "be conservative in [LendingClub's] assessment."[144] The presentation also explained that, although "[a]pproximately 10% of Level 1 complaints [were] deemed substantiated (all UDAAP related); formal coaching [was] provided to reinforce [the] importance of following [LendingClub] protocol and procedures."[145] The presentation further specified that the Company would implement a "revised marketing model" in the next month that "should result in improved targeted marketing" and address the "spike" in "Sales/Marketing/Advertising" complaint volume "driven by pre-screen

---

[142] *Id.* ¶ 105 (citing LC-Fisher_000928).

[143] Sparco Aff. Ex. B at LC-Fisher_000927.

[144] *Id*. at LC-Fisher_000929.

[145] *Id.*

complaints."[146] Finally, the presentation noted that "98% of complaints [were] resolved within 20 business days, as per policy."[147]

The Complaint alleges that the December 13, 2017 presentation "noted that the Company received '[a]pproximately 1,300 and 1,400 complaints' in September and October, respectively, and explained that the '[v]olume of complaints as percentage of key metrics is trending upwards.'"[148] It further alleges that "LendingClub received 185 'Level 1 Complaints' between September and October, 148 of which were classified as UDAAP related" and that one of the "'top 5 reasons' for level 1 complaints" was that the "consumer [was] upset that he/she received pre-approval marketing, then was denied a loan."[149]

Notably, the "Sales/Marketing/Advertising" category the Complaint focused on as one of the "Top 5" complaint categories the previous quarter[150] showed a decline in complaints (from 34 to 23) and did not appear as one of the "Top 5" complaint categories in the December 2017 presentation.[151] The presentation also

---

[146] *Id.* at LC-Fisher_000928.

[147] *Id.* at LC-Fisher_000927.

[148] Compl. ¶ 106 (alterations in original) (quoting LC-Fisher_001008).

[149] *Id.* (citing LC-Fisher_001012).

[150] *Id.* ¶ 105 (citing LC-Fisher_000928).

[151] Sparco Aff. Ex. B at LC-Fisher_001010-11 (listing as the "Top 5 reasons for complaints" from September to October 2017: "Advanced Fee Scam (47%)," "Credit Bureau Reporting (12%)," "Credit Determination (8%)," "Application Processing (6%)," and "Online Account Management (6%).").

pointed out that a "technical bug" had caused higher complaint volume in three of the "Top 5" complaint categories from September to October, that "[a]ll regulatory deadlines for complaint responses [had been] met," and that "98% of complaints [were] resolved within 20 business days, as per policy."[152] The minutes for the December 13, 2017 Risk Committee meeting also reflect that management "summarized the initiatives that [the] Company has taken to address consumer complaints."[153]

To summarize, the four presentations just discussed show that the Risk Committee was made aware on a regular basis of trends in customer complaint volume, the driving factors behind those trends, and steps the Company had taken to address those trends when necessary. But none of these presentations indicate that the Company had violated consumer protection laws. In other words, the four Risk Committee presentations on which plaintiff relies did not constitute a "red flag."[154]

---

[152] *Id.*

[153] *Id.* at LC-Fisher_001016.

[154] *See Reiter*, 2016 WL 6081823, at *13 ("None of these reports . . . states that the Company's . . . controls and procedures actually had been found to violate statutory requirements at any time or that anyone within [the company] had engaged in fraudulent or criminal conduct. In other words, the core factual allegations of the Complaint do not amount to red flags of illegal conduct.").

Plaintiff equates the allegations of the Complaint to those pled in two federal cases, but those cases are clearly inapposite. In *In re Abbott Laboratories Derivative Shareholders Litigation*,[155] the United States Court of Appeals for the Seventh Circuit, applying Delaware law, reversed a *Caremark* dismissal where it was alleged that a health care company engaged in "continuing violations of federal regulations over a period of six years."[156] After "four formal certified Warning Letters" from the FDA,[157] the FDA's refusal to continue its voluntary compliance plan with the company "after finding continued deviations from the regulations,"[158] an FDA lawsuit that resulted in "the largest penalty ever imposed for a civil violation of FDA regulations at that time,"[159] and the mandatory destruction of certain non-compliant testing kits accounting for almost $250 million in annual revenue,[160] stockholders filed suit and claimed that the board had breached its fiduciary duty. Emphasizing the "extensive paper trail . . . concerning the violations and inferred [board] awareness of the problems," the court held that the board's decision not to address "the magnitude and duration of the FDA violations" was a failure of oversight.[161]

---

[155] 325 F.3d 795 (7th Cir. 2003).

[156] *Id.* at 808.

[157] *Id.* at 799.

[158] *Id.* at 800.

[159] *Id.* at 801.

[160] *Id.*

[161] *Id.* at 809.

In *In re Veeco Instruments, Inc. Securities Litigation*,[162] the United States District Court for the Southern District of New York sustained a *Caremark* claim where it was alleged that "the Audit Committee abdicated its responsibility to monitor legal compliance and investigate whistleblower claims relating to the Company's allegedly flagrant, systematic, and repeated violations of export control laws."[163]  The complaint in *Veeco* asserted that, after receiving an employee report concerning the shipment of restricted items, the company "conducted an audit which revealed that at least nine other shipments . . . also had violated federal export control laws."[164]  Seven months after the company discovered these violations of law, moreover, the same employee reported "a second set of export violations."[165] Finding that the complaint sufficiently alleged board knowledge of these repeat export violations, the Court held that the board members faced a substantial likelihood of liability with respect to the claims asserted against them.[166]

The particularized factual allegations in *Abbott* and *Veeco* demonstrating board awareness of violations of law stand in stark contrast to what is alleged here. In short, the Complaint does not allege any particularized facts from which it

---

[162] 434 F. Supp. 2d 267 (S.D.N.Y. 2006).

[163] *Id.* at 277-78.

[164] *Id.* at 278.

[165] *Id.*

[166] *Id.*

41

reasonably can be inferred that any member of the Demand Board was put on notice that the Company had violated federal consumer protection laws in the manner alleged in the FTC action—a litigation that remains ongoing and is hotly disputed[167]—or otherwise. Given this fatal shortcoming, plaintiff has failed to demonstrate that a majority of the Demand Board faces a substantial likelihood of liability so as to excuse his failure to make demand under Rule 23.1 with respect to plaintiff's oversight claim under the second *Caremark* prong.

### C. The Complaint Fails to Allege Facts Sufficient to Show that a Majority of the Demand Board Faces a Substantial Likelihood of Liability for Allegedly False and Misleading Statements

The second claim for breach of fiduciary duty embedded in Count I is a disclosure claim. Plaintiff argues that, "[d]espite knowing that the FTC was investigating LendingClub over deceitful conduct against borrowers, Defendants . . . falsely represented that the [FTC] investigation related to the board review and

---

[167] *See Rojas*, 2019 WL 3408812, at *14 (rejecting the theory that the board demonstrated a conscious disregard for its duties "simply because . . . the Los Angeles City Attorney initiated coordinated civil proceedings against [the company] and three of its competitors asserting complex . . . claims that have been disputed vigorously").

previously disclosed internal control failures"[168] that was the subject of DOJ and SEC investigations.[169]

"[E]ven in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith."[170] "When there is no request for shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors '*deliberately* misinform[ed] shareholders about the business of the corporation, either directly or by a public statement.'"[171] Where, as here, directors are protected by an exculpatory charter provision, a plaintiff can demonstrate a substantial likelihood of liability that would excuse demand only by making "particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly, or intentionally."[172]

Plaintiff argues that a majority of the Demand Board directors face a substantial risk of liability for making and/or allowing LendingClub to make "false

---

[168] Pl.'s Answering Br. at 29.

[169] *See supra* Part I.B.

[170] *In re infoUSA, Inc. S'holders Litig.,* 953 A.2d 963, 990 (Del. Ch. 2007).

[171] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 132 (Del. 2009) (quoting *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998)).

[172] *Id.* (internal quotation marks and citation omitted).

statements and omissions that misrepresented and concealed the conduct the FTC was investigating."[173]  Plaintiff challenges essentially three different statements.

The first is the statement that appeared in the Company's public filings from November 2016 to November 2017 to disclose the Company's receipt of a grand jury subpoena from the DOJ on May 9, 2016 and contacts made by the SEC and FTC.[174]  Importantly, each of these disclosures was made *before* the Company received a draft of the FTC complaint in December 2017.  The first disclosure, which appeared in the Company's Form 10-Q for the third quarter of 2016, filed on November 9, 2016, stated the following:

> On May 9, 2016, following the announcement of the board review described elsewhere in this filing, the Company received a grand jury subpoena from the U.S. Department of Justice (DOJ).  The Company was also contacted by the SEC and Federal Trade Commission ("FTC").  The Company continues cooperating with the DOJ, SEC, FTC and any other governmental or regulatory authorities or agencies.  No assurance can be given as to the timing or outcome of these matters.[175]

The next four disclosures—which plaintiff admits were "virtually identical"[176]— appeared in the Company's 2016 annual report on Form 10-K and its quarterly

---

[173] Pl.'s Answering Br. at 22-23.

[174] *Id.* at 29 (citing Compl. ¶¶ 123, 141, 149, 154-55).

[175] LendingClub Corp. Quarterly Report at 36 (Form 10-Q) (Nov. 9, 2016) (quoted at Compl. ¶ 123).

[176] Pl.'s Answering Br. at 29.

reports on Form 10-Q for the first, second, and third quarters of 2017.[177]  This opinion refers to these five disclosures collectively as the "Pre-December 2017 Disclosures."

The second challenged statement consists of the disclosure that appeared in the Company's 2017 annual report on Form 10-K filed on February 22, 2018—*after* the Company received a draft complaint from the FTC in December 2017 alleging five violations.[178]  Unlike the disclosure in the five previous reports, this disclosure described the nature of the claims the FTC was investigating:

---

[177] *Id.* (citing Compl. ¶¶ 141 (quoting Form 10-Q for Q1 2017), 149 (quoting Form 10-Q for Q2 2017), 155 (quoting Form 10-Q for Q3 2017)).  The court takes judicial notice that these reports were filed on May 5, 2017, August 8, 2017, and November 8, 2017, respectively.  Plaintiff's brief references a similar statement from the Company's annual report on Form 10-K for 2016, filed on February 28, 2017, but provides no citation to the Complaint for such statement.  *Id.*  Plaintiff also contends that a disclosure in the Company's 2017 Form 10-K is "virtually identical" to these disclosures.  *Id.* (citing Compl. ¶ 163).  As discussed above, however, the relevant disclosure in the 2017 Form 10-K is qualitatively different than these previous disclosures.

[178] Compl. ¶¶ 109, 160.

> On May 9, 2016, following the announcement of the Board Review, the Company received a grand jury subpoena from the U.S. Department of Justice (DOJ). The Company also received formal requests for information from the SEC and Federal Trade Commission (FTC). ***The FTC Staff is investigating questions concerning certain of the Company's policies and practices and related legal compliance.*** We have worked and continue to work to respond to the FTC's information requests, and have cooperated closely with FTC Staff ***as they evaluate potential claims of deception or unfairness under the FTC Act and other consumer protection laws enforced by the FTC***. While we are not able to predict with certainty the timing, outcome, or consequence of this investigation, we believe that we are in compliance with all applicable federal and state laws related to this matter.
>
> The Company continues cooperating with the DOJ, SEC, FTC, and other governmental or regulatory authorities or agencies. No assurance can be given as to the timing or outcome of these matters. However, to the extent that the Company continues to incur expenses to defend or respond to these investigations, insurance policy coverage limits have been met, as described above, so that the Company will not have insurance available to offset any costs.[179]

This opinion refers to this disclosure as the "Post-December 2017 Disclosure."

The third challenged statement comes from comments Sanborn made during a conference call for stockholders and analysts on February 20, 2018, allegedly "in the context of having settled a class action lawsuit alleging violations of the Exchange Act."[180] The Complaint begins by quoting the following comments Sanborn made:

---

[179] *Id.* ¶ 163 (quoting Form 10-K for 2017) (emphasis added).

[180] *Id.* ¶ 158.

I do want to remind you that we are still addressing other outstanding legacy issues that will result in elevated legal costs. They are detailed in our upcoming 10-K that include litigation, ongoing government investigations from the SEC, DOJ and FTC and indemnification obligations for former employees. While it may take a few quarters for us to get these issues resolved, today's announcement is a major step forward in putting the events of 2016 behind us.[181]

The Complaint next quotes Sanborn's response to a question about "which cases have been settled" and "the magnitude of the remaining cases:"[182]

So, in terms of lawsuits, this is the federal and the state class action lawsuits, they were arising out of the 2016 disclosures. In terms of the scale of these, we do believe that these represented our largest financial exposure.

The remaining issues, as I indicated, are derivative lawsuit [sic] from this which is not against the company and then some ongoing government investigations with the SEC, DOJ and FTC, so obviously, difficult to predict the outcome of those with any certainty, but we are cooperating there and moving quickly to resolve those.[183]

Plaintiff asserts that all of the challenged statements were "false and misleading because, by lumping together the FTC investigation with SEC and DOJ investigations and relating them all to the board review of the investor fraud, Defendants created the impression that the FTC's investigation was related to the sales of non-conforming loans and the reporting of related party transactions which

---

[181] *Id.*

[182] *Id.* ¶ 159.

[183] *Id.*

47

the market knew the DOJ and SEC were investigating."[184]  Defendants counter that plaintiff has failed to allege particularized facts showing that a majority of the Demand Board deliberately lied to investors—*i.e.*, did so "in bad faith, knowingly or intentionally"[185]—so as to face a substantial likelihood of personal liability.  The court agrees with defendants for several reasons.

First, none of the challenged statements was materially false or misleading. To begin, the Post-December 2017 Disclosure expressly states that the FTC was "investigating questions concerning certain of the Company's policies and practices and related legal compliance" pertaining to "potential claims of deception or unfairness under the FTC Act and other consumer protection laws enforced by the FTC."[186]  This statement on its face reasonably cannot be construed to create the misleading impression that the FTC was investigating the sales of non-conforming loans or the reporting of related party transactions.

The Pre-December 2017 Disclosures also are not materially false or misleading because they do not identify the subject matter of any of the DOJ, SEC, or FTC inquiries.[187]  They only disclose that the Company received inquiries from three government agencies—one of which occurred on May 9, 2016, after the

---

[184] Pl.'s Answering Br. at 30.

[185] *In re Citigroup,* 964 A.2d at 132.

[186] Compl. ¶ 163.

[187] *See id*. ¶¶ 123, 141, 149, 155.

"announcement of the board review"—and that the Company was continuing to cooperate with each agency.[188]  Without some explanation concerning the subject matter of the DOJ and SEC inquiries, a reasonable stockholder would not conclude that the FTC inquiry must have concerned the same subject matter as the DOJ and SEC inquiries, particularly given that the Company's public filings disclosed that the FTC enforces prohibitions against "unfair and deceptive acts or practices in or affecting commerce."[189]

As for Sanborn's statements on the February 20, 2018 conference call, they merely pointed out that, despite settling the securities litigation arising out of the Company's disclosure of material weaknesses in its internal controls, LendingClub was still subject to other litigation and "government investigations" by the SEC, DOJ, and FTC that would "result in elevated legal costs."[190]  Once again, nothing was said about the subject matter of the DOJ, SEC, or FTC inquiries so as to create any misimpression about the nature of the FTC investigation.  As the district court reasoned in the Securities Action, Sanborn did not create a false impression about the FTC investigation because his comments "say nothing about the substance of any of the investigations – they simply disclose that the Company has and will

---

[188] *Id.*

[189] *Id.* ¶¶ 118, 134.

[190] *Id.* ¶¶ 158-59.

continue to incur costs in connection with government investigations and lawsuits."[191]

Second, the Complaint fails to allege particularized facts demonstrating that any of the Demand Board directors face a substantial likelihood of personal liability concerning Sanborn's comments for two additional reasons. The first reason is that Complaint fails to allege facts to support a reasonable inference that Sanborn intended to mislead investors about what the FTC was investigating. To the contrary, Sanborn expressly qualified his comments by telling investors that the FTC investigation would be "detailed" in the "upcoming 10-K," which was issued *two days later* and unambiguously explained that the FTC was investigating "claims of deception or unfairness under the FTC Act and other consumer protection laws enforced by the FTC."[192] This qualification negates any reasonable inference of an intention by Sanborn to mislead. The second reason, which relates to the other members of the Demand Board, is that the Complaint fails to allege that any of the outside directors played a role in the making of Sanborn's comments during the February 20, 2018 conference call.[193]

---

[191] *LendingClub Corp.*, 2020 WL 3128909, at *10.

[192] Compl. ¶¶ 158, 163.

[193] *See In re Citigroup*, 964 A.2d at 134 (holding that "the Complaint does not contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow me to reasonably conclude that the director defendants face a substantial likelihood of personal liability").

Third, as to the Pre-December 2017 Disclosures, the Complaint fails to plead particularized facts creating a reasonable inference that a majority of the Demand Board directors acted with scienter. The premise of plaintiff's claim is that "by September 2016," the Demand Board "possessed actual knowledge that the FTC's investigation did not concern investor fraud, but wholly unrelated conduct."[194] The Complaint fails, however, to plead particularized facts to support this assertion.

To start, the Complaint does not identify the contents of the May 2016 CID and does not allege that any member of the Demand Board reviewed the May 2016 CID. Although the pre-December 2017 presentations to the Risk Committee cited in the Complaint touch on the subject matter of the May 2016 CID, their descriptions are ambiguous and provide no clarity on what the FTC was investigating. For example, the September 2016, December 2016, and March 2017 Risk Committee presentations described the May 2016 CID as: "Driven by [the] May 9th events and [the] FTC is looking at on-line lending and data security; particularly complaints received by FTC regarding [LendingClub]."[195] On the one hand, the reference to "[d]riven by [the] May 9th events" suggests that the FTC investigation related to the internal control weaknesses that the Company announced on May 9, 2016. On the

[194] Pl.'s Answering Br. 23.

[195] Sparco Aff. Ex. B at LC-Fisher_000802, 000849, 000888 (cited at Compl. ¶¶ 107, 108, 125, 136, 143).

other hand, the references to "on-line lending and data security" and "complaints received by [LendingClub]" suggest that the FTC may have been investigating conduct unrelated to internal control weaknesses, but those references are simply too vague to draw any clear conclusions.[196]

In short, the Complaint fails to plead particularized facts to support plaintiff's contention that a majority of the Demand Board directors "possessed actual knowledge" before December 2017 that the subject matter of the FTC's investigation concerned conduct "wholly unrelated" to the investor fraud allegations arising from the internal control weaknesses the Company identified in May 2016.[197] Thus, assuming for the sake of argument that a reasonable stockholder would have been misled by the Pre-December 2017 Disclosures into believing that the DOJ, SEC, and FTC each were investigating investor fraud, the Complaint does not sufficiently plead that the Demand Board directors possessed the information necessary to have *knowingly* lied to investors with respect to those disclosures.

---

[196] Plaintiff cites paragraphs 137 and 144 of the Complaint for the assertion that "Board materials are clear that the Director Defendants discussed the FTC's investigation as unrelated to the investigations by the DOJ and SEC." Pl.'s Answering Br. 23. The cited paragraphs quote parts of the minutes of Risk Committee meetings held on December 14, 2016 and March 17, 2017. Those excerpts show that the Risk Committee was updated on the status of a series of regulatory matters and investigations, but they do not describe the subject matter of the FTC investigation (or any of the other investigations) and thus do not support plaintiff's contention that the directors "possessed actual knowledge" that the FTC investigation was "wholly unrelated" to the investigations relating to investor fraud.

[197] Pl.'s Answering Br. 23.

Fourth, even accepting as true plaintiff's contention that the Demand Board directors knew before December 2017 that the FTC investigation did not concern investor fraud, the Complaint still does not sufficiently plead that the Demand Board directors *deliberately* lied to investors about the FTC investigation because none of the Pre-December 2017 Disclosures represented that the FTC was investigating investor fraud. On this point, the district court's analysis in the Securities Action again is instructive:

> [E]ven if Defendants knew what practices the FTC was investigating, Plaintiffs' allegations fail to establish each Defendant's state of mind. Plaintiffs do not argue that any of the statements were false on their face – only that Defendants omitted at first the existence of an FTC investigation, and later the specific targets of that investigation. To sufficiently plead scienter for allegedly misleading omissions, however, Plaintiffs must allege "a highly unreasonable omission" and facts to support the inference that Defendants either knew that their omissions were misleading the investors or that the potential for misleading the public was so obvious that Defendants must have been aware of it. . . . None of the facts alleged in the [complaint] establish the state of mind of any of the Defendants.[198]

In sum, to plead that LendingClub's directors face a substantial likelihood of liability so as to excuse the failure to make a demand with respect to a disclosure claim, plaintiff must allege particularized facts showing that a majority of the Demand Board deliberately lied to investors—*i.e.*, did so "in bad faith, knowingly

---

[198] *LendingClub Corp.*, 2020 WL 3128909, at *15 (internal citation omitted).

or intentionally."[199]  Because the Complaint fails to do so for the reasons explained, the disclosure claim within Count I must be dismissed.

* * * * *

For the reasons explained in Parts III.B-C, the oversight and disclosure claims embedded in Count I must be dismissed for failure to make a demand.  Plaintiff has conceded, furthermore, that demand was not excused as to *Brophy* claim within Count I.  Thus, Count I must be dismissed in its entirety under Rule 23.1.

### D.  Demand is Not Excused for the Unjust Enrichment Claim

Count II of the Complaint asserts that defendants were "unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to LendingClub."[200]  Given plaintiff's concession that this claim rises or falls with the viability of the breach of fiduciary duty claim in Count I, Count II also must be dismissed for failure to make a demand.[201]

## IV.  CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Complaint in its entirety is GRANTED.

---

[199] *In re Citigroup,* 964 A.2d at 132.

[200] Compl. ¶ 209.

[201] Mot. to Dismiss Hr'g Tr. at 81 (July 2, 2020) (Dkt. 56).